IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

TERESA DREYER                §
                             §
V.                           §   CIVIL ACTION NO. 4:06-CV-644-Y
                             §
CITY OF SOUTHLAKE, ET AL.    §

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
AND DENYING MOTION TO STRIKE AND MOTION TO SUPPLEMENT

Pending before the Court is defendant City of Southlake's Motion for Summary Judgment [doc. #68], as well as the defendant's Motion to Supplement Summary Judgment Record Under Rule of Optional Completeness [doc. #93]. Also before the Court is Plaintiff's Objections to and Motion to Strike Defendant's Motion for Summary Judgment Evidence [doc. #89]. After review of the motions, responses, replies and supporting evidence, the Court GRANTS the City's motion for summary judgment of the City of Southlake ("the City"), and DENIES both the City's motion to supplement and Plaintiff's motion to strike as moot.[1]

I. Background

At the outset, the Court notes that the City has argued that the factual statement within the court of appeals's opinion affirm-

---

[1] In her motion to strike, Plaintiff complains that the City has attempted to make use of irrelevant and unauthenticated documentary evidence. [Pltf. Mtn. to Strike at 2-6.] Plaintiff also contends that the declarations of Andrew Wambsganass (the City's mayor) and Ray Campbell (an investigator with the Tarrant County District Attorney's office) are irrelevant and not based on personal knowledge. [*Id.* at 6-8.] Because the Court has not relied upon this evidence in any way in its analysis, the motion to strike is DENIED. The City's motion to supplement is addressed later in this order.

ing a previous order of summary judgment in this case should be given preclusive effect in the decision of the current summary-judgment motion. "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *See Next Level Communs. L.P. v. DSC Communs. Corp.*, 179 F.3d 244, 255-56 (5th Cir. 1999) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)). The factual findings of the previous summary judgment, as affirmed by the court of appeals, may indeed have some preclusive effect regarding the plaintiff's factual allegations in response to the instant motion.

The previous summary judgment, however, was granted after this Court entered a scheduling order limiting the parties to addressing immunity defenses and staying all other proceedings, including discovery. [doc. #13] Moreover, the only issues decided by the court of appeals was the propriety of granting summary judgment without discovery and whether certain city officials acted reasonably for Texas qualified-immunity purposes. *See generally Dreyer v. Yelverton*, No. 07-10970, 2008 U.S. App. LEXIS 18501 (5th Cir. September 16, 2008). As a result, the court of appeals's factual statement does not have the broad preclusive effect argued by the City. *See Harper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389, 395 (5th Cir. 2001) ("Traditional rules of preclusion as adopted in

federal case law--whether under the doctrine of collateral estoppel or res judicata--require that the party to be estopped from re-litigating a claim have had a full and fair opportunity to litigate the issue."); *also see Rufenacht v. Iowa Beef Processors*, 656 F.2d 198, 202-03 (5th Cir. Unit A 1981) ("Collateral estoppel is appropriate only when the *identical issue* has been fully litigated . . . .") (emphasis added).  The Court will, therefore, recite the general factual background as affirmed by the court of appeals, separately discuss factual allegations specific to this motion, and discuss preclusion issues where relevant.

A.    Facts From the First Summary Judgment and Appeal

Plaintiff Teresa Dreyer began her employment with the City as a water-utilities assistant in the public works administration in June 2003, and remained in that position until her termination in April 2006.  She was terminated for falsifying her timesheets, being absent from work, working at home, and working overtime without permission.

Dreyer reported to the public works operations manager, who at the time was Michael Ray Patterson.  Patterson, in turn, reported to Pedram Farahnak, the director of the public works administration.  According to Dreyer, when she was hired her husband was suffering from a serious illness.  She claims that Patterson and Farahnak "allowed her to work a flexible schedule" so that she could attend

to her husband's needs. [Resp. App. at 248, Farahnak Dec. at ¶ 4.]
This flexible schedule allegedly included allowing Dreyer to work
from home, to work hours outside the normal 8:00 a.m. to 5:00 p.m.,
and to report to work late.  Despite her allegedly flexible sched-
ule, Dreyer claims that she still "exhausted [her] vacation and sick
leave in order to care for [her husband]."

In 2004, the City's mayor directed an investigation of the
public works department because of suspicions of financial misman-
agement and misconduct.  The City sought the involvement of the
Tarrant County district attorney, and employed a law firm to assist
in the investigation of corruption in the public works department.

The investigation, which concerned fraudulent timesheets,
accepting bribes, and using city resources for personal benefit,
culminated in a number of terminations and criminal charges.
Patterson and a public works supervisor named Jimmy Funderburg lost
their jobs and were criminally prosecuted and convicted for, among
other things, receiving payment for work they did not perform.

Dreyer asserts that she fully cooperated with the district
attorney's investigation, and claims to have questioned Patterson's
financial practices while he was her supervisor.  Dreyer also
asserts she was the last person the district attorneys interviewed
before Patterson was indicted, and she claims that she was going to
testify against him.  Kendrick replaced Patterson as the public
works operations manager in June 2005.

As part of her duties, Dreyer was responsible for collecting the timesheets for employees in the public works department and reviewing them to ensure they were complete and accurate. These timesheets are prepared by employees and are used by the City to determine an employee's pay. After Dreyer's review, she was required to forward the timesheets to Kendrick for his review and final approval.

Under the City's written rules and policies, Dreyer was a "nonexempt employee." As such, her normal working hours were Monday through Friday from 8:00 a.m. to 5:00 p.m. with one hour for lunch permitted each day. Overtime hours and work performed from home or outside her normal duty hours and days required Kendrick's approval.

On March 27, 2006, Dreyer turned in a timesheet to Kendrick reflecting that for the two-week pay period beginning Sunday, March 12, through Friday, March 25, she worked a total of ninety-six hours. Her timesheet claims that she worked eight hours per day from 8:00 a.m. to 5:00 p.m. Monday through Friday for eighty total hours. Dreyer also claimed sixteen hours of overtime: six hours on Sunday, March 12, for processing work orders, and ten hours for working through lunch each workday "to help field crew with issues."

After receiving her timesheet, Kendrick immediately informed Dreyer, via memorandum, that he had placed her "on paid administrative leave . . . pending consideration of [her] falsely reporting payroll records." The next day, March 28, Dreyer e-mailed Hugman

and Yelverton, and the public works administration director, Price (who has replaced Farahnak), and stated that, during the week of March 19 through March 25, she "reported to work around 10:00 a.m. each morning . . . and left work at 5:00 p.m. each afternoon.  The only day [she] took lunch was on Friday and [she] was gone for 1.5 hours."  Dreyer explained that, on March 21 through March 23, she worked at home in the evenings on the City's annual water-quality report.  She stated:

> I started recreating the report that evening [referring to March 21].  I worked 3 hours that evening from 7:00 p.m. to 10:00 p.m.  I completed most of page 2 containing a large table and material.  On March 22, I worked 3 hours from 7:00 p.m. to 10:00 p.m. and completed page 3 containing tables and documented water material.  On March 23, I worked 3 hours on the cover page and formatting the document with required breaks in columns and tables for the printer to reformat into their software . . . .  I worked a total of 9 hours on this report.  I reported 5 hours.  When [Kendrick] accused me of misrepresenting my time I told him I would take the hours off and did so.

[*Id.*]  Nowhere on Dreyer's original timesheet, however, did she reflect that she worked on the water-quality report at her home for three hours (total of nine) on March 21, 22, and 23.  And she did not mention this when Kendrick questioned her.  Accepting Dreyer's e-mail as true, she accounts for a total of 93.5 hours for the two-week pay period from March 12 through March 25—2.5 hours less than what she had originally claimed.  Dreyer concedes in her March 28 e-mail that she "did not ask permission to create this document from home," and that "it is solely [her] fault that [she] did not

ask [Kendrick] about working on the water-quality report at home."

In an April 3 memorandum to Dreyer, Kendrick stated that his records reflected: she had worked only 30.75 hours during the week of March 19 to March 25 (although she submitted 45 hours); she failed to notify Kendrick, her immediate supervisor, that she would be late on any day from March 19 to March 25; and she was not authorized to work overtime hours or from home. Subsequently, for summary-judgment purposes, Kendrick stated by declaration that after reviewing the water-quality report Dreyer alleged she worked on at home it did not "represent any significant amount of time expended by Ms. Dreyer, and particularly [did] not support her claim that she had spent six hours working at her home on March 12 and her other claim that she had worked nine hours at home . . . the following week."

Kendrick's April 3 memorandum also questioned Dreyer's claim that she worked six overtime hours processing work orders at home on Sunday, March 12, because Dreyer did not possess the necessary software at her home. Kendrick concluded that Dreyer had submitted a false timesheet, was absent from work without notice or permission, and failed to receive written permission to work at times outside of her normal authorized working hours or to work overtime. The City's employee handbook states, "Nonexempt employees performing work at any time other than authorized working hours is strictly forbidden unless authorized in writing by the employee's supervi-

sor." Additionally, the handbook provides for, inter alia, the termination of employees who are "[a]bsen[t] from duty without notice to and permission from the immediate supervisor except in circumstances beyond control which prevent giving notice" and for employees who "falsify[] personnel records." Accordingly, through the April 3 memorandum, Kendrick informed Dreyer that she was terminated for these actions.

When Kendrick originally questioned Dreyer about her timesheet on March 27, she responded by removing the 16 overtime hours. Dreyer explained, in her declaration in opposition to the previous motion for summary judgment, that she inadvertently wrote "work orders," rather than "purchase orders," on the timesheet.

On April 7, Dreyer filed a grievance with Price, the public works administration director, challenging her termination. On April 13, Price held a hearing on the matter at which Kendrick and a human-resources employee were present. No transcript from the hearing was offered into evidence in the first summary-judgment proceedings and none is now before the Court. Based on Price's April 21 letter to Dreyer, recounting what she said at the hearing and upholding her termination, Dreyer is said to have conceded: she did not have Kendrick's permission to work overtime at the office or her home; and the hours reflected on the timesheet did not reflect the actual hours she worked. Price concluded Dreyer submit-ted a false timesheet and did not receive permission to work over-

time or at home.

Dreyer appealed Price's termination decision to Yelverton, the city manager, on April 26. As part of her appeal, she submitted a statement to Yelverton and Hugman (the City human resources director), asserting: the overtime hours Dreyer submitted were hours worked from home; she had never been required to obtain her supervisor's consent to be absent; and her termination was in retaliation for her absence from work due to her husband's illness. In her appeal, Dreyer admitted, however, that although her timesheet stated she worked from 8:00 a.m. to 5:00 p.m. on Monday, March 20, to Friday, March 24, she reported to work at least an hour late on Monday through Thursday of that week. She also claimed she notified Kendrick she would be late, but conceded she "may not have had his permission."

Yelverton conducted a hearing on May 30, in accordance with the City's complaint and grievance procedure. Again, no transcript of this hearing was submitted to the Court during the initial summary-judgment proceeding and none is now before the Court. On June 8, Yelverton notified Dreyer, by letter, that the termination was being upheld.

Dreyer filed this action raising, through 42 U.S.C. § 1983, claims against the City, as well as Yelverton, Hugman, and Kendrick in their official capacities, for violations of her rights to free speech, equal protection, and due process. Dreyer also presented

a state-law defamation claim against Yelverton, Hugman, and Kendrick (the "individual defendants") in their individual capacity. The individual defendants responded by raising immunity defenses and by filing a motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss for failure to state a claim. On October 19, this Court entered an initial scheduling order for consideration of the absolute-immunity and absolute-privilege defenses and ordered Dreyer to file a Rule 7(a) reply. The individual defendants' 12(b)(6) motion was denied as premature. Later, on October 24, the initial scheduling order was modified to allow the individual defendants to pursue qualified, official, or absolute immunity, or absolute privilege. Discovery was stayed until the immunity defenses were resolved.

Dreyer filed her Rule 7(a) reply and the individual defendants then filed their motion for summary judgment, asserting, inter alia, official immunity under Texas law. After denying a motion by Dreyer to allow discovery on the immunity defenses, this Court granted summary judgment in favor of the individual defendants on Dreyer's defamation claim by order dated August 22. The order also dismissed Dreyer's federal civil-rights claims against the individual defendants. On September 19 this Court entered a judgment in favor of the individual defendants pursuant to Rule 54(b), dismissing with prejudice all claims against them. On September 16, 2008, the opinion of the United States Court of Appeals for the Fifth Circuit

affirming that judgment issued as mandate.  Now under consideration is the City's motion for summary judgment.

B.  Additional Facts

In its motion, the City raises several arguments in attempting to defeat Dreyer's claims.  The City argues that Dreyer cannot establish all of the essential elements of her First Amendment retaliatory termination claim because the City officials responsible for her termination were unaware of her cooperation with the district attorney's investigation.  The City additionally contends that, even assuming Dreyer has made out the elements of her retaliatory-termination claim, the claim nevertheless fails because Dreyer would have been terminated based upon her conduct regardless of her speech.  According to the City, Dreyer has also failed to establish any disparate treatment in support of her First Amendment claims as well.  The City further argues that Dreyer has failed to establish that her termination was a result of an unconstitutional policy or the unconstitutional act of a policymaker, as is required in a suit against a municipality.

Both the City and Dreyer offer extensive factual statements regarding these issues in their briefing as well as substantial supporting summary-judgment evidence.  Because the Court's resolution of this motion for summary judgment does not address the legal issues to which such facts are relevant, the Court does not does

address these facts.  Similarly, because the Court's decision does not address the evidence that is the subject of the City's motion to supplement or Dreyer's motion to strike, the Court DENIES both as moot.

The City's official policies relating to its employment agreements and termination practices are, however, relevant to Dreyer's claims now before the Court.  According to Dreyer, under the City's disciplinary procedures, non-probationary employees could make use of the City's grievance and appeal procedure to contest an adverse employment decision. [Resp. Br. at 48-49.]  Under the City's "Complaint and Grievance Procedure" a regular (i.e., non-probationary or temporary) employee may challenge an adverse employment decision by challenging the decision orally before the employee's immediate supervisor within five days. [Resp. App. at 285.]  The employee may then pursue a written complaint to the head of his department. [*Id.*] Finally, the employee may appeal the department head's decision to the city manager. [*Id.*]  The procedure's stated purpose is to "settle matters on as low an administrative level as possible, as soon as possible after the applicable event, and to discover, whenever possible, mutually satisfactory solutions to problems which arise." [*Id.*]

Despite this purpose statement, both the City's employee handbook and the complaint and grievance procedure contemplate swift and unfettered action by the City in accordance with an at-will

employment relationship.  The City's handbook provides:

> Effect of Probationary Period: The successful completion
> of the probationary period, and the existence of and
> access to the appeal procedure shall not constitute any
> limitation on the rights of the City of Southlake to
> manage its affairs.  All employees hold their positions
> at the will and pleasure of the City and such positions
> may be terminated or otherwise adversely affected with or
> without cause, when in the opinion of the City Manager
> such action is in the best interest of the City.

[Mtn. App. at 222.]  Similarly, the complaint and grievance proce-

dures states:

> Effect of Procedure: The existence of and access to the
> appeal procedure shall not constitute any limitation on
> the rights of the City of Southlake to manage its af-
> fairs.  All employees hold their positions at the will
> and pleasure of the City and such positions may be termi-
> nated or otherwise adversely affected with or without
> cause.

[Resp. App. at 287.]

Dreyer contends that, despite these provisions, the City

employed progressive discipline.  Indeed, according to Farahnak,

"the City always practiced progressive discipline with respect to

employment." [Resp. App. at 250, Farahnak Dec. at ¶ 17.]  Farahnak

states that the City would provide an "awareness warning" prior to

terminating an employee. [*Id.*]  Yet Farahnak acknowledges under some

circumstances "employees were terminated immediately and without

warning." [*Id.*]

The City's policies are also relevant to the extent that they

dictated that its employees cooperate with the investigation.

According to Yelverton all City employees were expected to cooperate

13

with the investigation into the public works administration as part of their job responsibilities. [Mtn. App. at 264, Yelverton Dec. at ¶ 35.] Yelverton states that any employee who failed or refused to cooperate with the investigation would be subject to disciplinary action, "up to and including termination." [*Id.*] Employees in supervisory capacities were instructed to accommodate the investigation by allowing employees to be away from work to meet with investigators if so requested and to allow use of City facilities to conduct such meetings. [*Id.*] Employees were also paid their normal rate of compensation for time at work spent meeting with investigators. [*Id.*] Dreyer has not produced evidence to contradict this state of affairs and even seems to acknowledge that cooperation was required as part of her job. In her brief, Dreyer asserts that Yelverton, along with Hugman "created Southlake policy with respect to the District Attorney's investigation [and the] internal investigation." [Resp. Br. at 6.] She further states that Yelverton assisted the investigators in developing a time line for the investigation and with the logistics of employee interviews and other information gathering. [*Id.*]

Dreyer complains that both Hugman and Kendrick were allowed to participate in her grievance procedures. While employed with the City, Dreyer asserts that she noticed Hugman's vehicle in an area where City owned vehicles were parked to be repaired. She further observed City employees around Hugman's car, leading her to conclude

that Hugman was having his car serviced by City employees.  This, Dreyer asserts, was an improper use of City resources. [Resp. App. at 20-23, Dreyer Dep. at 31-34.] Dreyer further asserts that Hugman approved timesheets submitted by Nathan Davis.  Davis was a part time employee and thus ineligible to take paid holiday leave. [Resp. App. at 151, Hugman Dep. at 29]  Nevertheless, Davis submitted timesheets claiming holiday pay and, according to Dreyer, Hugman approved these timesheets. [Resp. App. at 12, 14-15, Dreyer Dep. at 20, 22-23.]  Dreyer maintains that Hugman was aware of her coopera-tion in the district attorney's investigation and of her providing information regarding Hugman as part of the investigation. [Resp. App. at 349, Dreyer Dec. at ¶ 10; Resp. App. at 152-53, 186, Hugman Dep. at 30-31, 99.] Dreyer now complains that despite this apparent conflict of interest Kendrick consulted Hugman in making the deci-sion to terminate her.  [Resp. App. at 135, Kendrick Dep. at 249]

Kendrick himself was improperly motivated in making the termi-nation decision according to Dreyer.  She bases this on Kendrick's deposition statements that the district attorney's investigation was a "sore subject" that he "tried to minimize" conversation about it. [Resp. Br. at 13-14 (citing Resp. App. at 114, Kendrick Dep. at 71).] Dreyer apparently theorizes that Kendrick terminated her in an attempt to move on after the investigation. [*Id*.]

Finally, as she has all along, Dreyer contends that her termi-nation and grievance proceedings were in error because she had

permission to engage in the challenged activities. And, unlike in the previous order granting summary judgment, Dreyer now has the support of evidence gathered during discovery. For instance, she contends that she had permission to work on the report at home. Dreyer alleges that, in 2004, Farahnak asked her to prepare a map in addition to the report. [Resp. App. at 248, Farahnak Dec. at ¶ 5.] Because Dreyer had the software to prepare the map at home but not at her office and because Dreyer faced "constant interruptions" due to the fact that her workstation was in a hallway, Farahnak allegedly allowed her to prepare the report at home in 2004 and thereafter. [*Id.*]

Farahnak also supports Dreyer's contention that she had permission to vary her work schedule and file timesheets reporting hours that were different from those actually worked. Farahnak states that because of Dreyer's husband's illness, he had given Dreyer permission to work a flexible schedule. [Resp. App. at 248, 249, Farahnak Dec. at ¶ 4, 10.] Kendrick was made aware of this arrangement when hired by Farahnak. [*Id.*] Further, in light of her flexible work schedule and the fact that the City's timesheets did not allow hours outside of 8:00 a.m. to 5:00 p.m. to be reported, Farahnak claims to have instructed Dreyer to "submit timesheets that reflected hours that were different from those she actually worked." [Resp. App. at 248, Farahnak Dec. at ¶ 4.]

## II.  Legal Standards

### A.  Summary-Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate.  FED. R. CIV. P. 56(c).  An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo County.*, 246 F.3d 481, 489 (5th Cir. 2001).  Facts are considered "material" if they "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To determine whether there are any genuine issues of material fact, a court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990).  Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party.  *See id.; see also Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, a court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits.  *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's

motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, a court's function is not to weigh the evidence and determine the truth the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing *Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

B.  Suit Against a Municipality Under 42 U.S.C. § 1983

Section 1983 provides a vehicle for the redress of a violation of federal law by those acting under the color of state law.  *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 19 (1980).  To prevail on a § 1983 claim, a plaintiff must prove that a person acting under color of state law deprived him of a right secured by the Constitution or laws of the United States.  *See* 42 U.S.C. § 1983.  A plaintiff may pursue a claim under § 1983 against a municipality.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978).  A municipality may be sued under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at 690.  A municipality may also "be sued for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels."  *Id.* at 690-91.

In order for a municipality to incur liability under § 1983, there must be a direct causal link between the alleged constitutional deprivation and the municipal policy or custom.  *See Piotrowski v. City of Houston*, 51 F.3d 512, 517 (5th Cir. 1995).  "Municipalities are not vicariously liable for the actions of their employees under § 1983."  *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).  "Municipal liability only inures when the execution of a

local government's policy or custom causes the injury." *Id.* The Fifth Circuit has defined "official policy" as "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984).

C.  First Amendment Retaliation Claim

To succeed on a claim that she was terminated in retaliation for exercising his First Amendment rights, a plaintiff must "show that his conduct was constitutionally protected, and that this conduct was a substantial factor . . . or . . . motivating factor" in the defendant employer's decision to terminate him. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 247, 287 (1977). The Fifth Circuit has stated the elements of a free-speech retaliatory termination claim in the context of public employment as requiring the plaintiff to show "(1) he suffered an adverse employment action, . . . (2) he spoke as a citizen on a matter of public concern, . . . (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, . .

. and (4) the speech precipitated the adverse employment action."
*Nixon v. City of Houston,* 511 F.3d 494, 497 (5th Cir. 2007).

Under the second element, the threshold inquiry is "whether the plaintiff was speaking 'as a citizen' or as part of [his] public job." *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) (quoting *Mills v. City of Evansville*, 452 F.3d 646, 647-48 (7th Cir. 2006)). If the government has penalized the plaintiff's speech "as a citizen," the court then considers the subject matter of the speech to determine if it is on a topic of public concern. *See id.; see also Charles v. Grief*, 522 F.3d 508, 512-15 (5th Cir. 2008). Conversely, speech made as part of, or in relation to, one's job duties, is not protected by the First Amendment. *See Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir. 2007). In determining whether speech is on a topic of public concern, the court looks to "the content, form, and context of a given statement." *see Charles v. Grief*, 522 F.3d 508, 514 (5th Cir. 2008). *Grief*, 522 F.3d at 514. "It is well-established . . . that speech relating to official misconduct . . . almost always involves matters of public concern." *Id*.

After the plaintiff has established a prima-facie case of a constitutional violation and that such violation was a substantial or motivating factor in the adverse employment decision, the burden "shifts to [the] defendant[] to show by a preponderance of the evidence that [it] would have come to the same conclusion in the

absence of the protected conduct." *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).

D.  Equal-Protection Claim

An equal-protection claim focuses on three elements. *See Mahone v. Addicks Util. Dist.*, 836 F.2d 921, 933 (5th Cir. 1988). First, it must be determined if the government has attempted to classify or distinguish between two or more relevant persons or groups. *See id.* at 932. "[T]he clause's protection reaches only dissimilar treatment among similar people." *Id.* Next, a court must evaluate what purposes the government's classification of persons such as the plaintiff is meant to serve. *See id.* at 933. Third, the court is to evaluate the "fit" between the classification and the purpose. *See id.* How important the government's purpose must be and how strictly the "fit" between the classification and purpose is reviewed depends on the nature of the classification. *See id.* at 933-34 & n.12 (noting that as a general rule, government classifications are presumed valid and are sustained if the classification is "rationally related" to a "legitimate interest" but that, when the classification is made on the basis of race, alienage or national origin, or when the classification impinges on personal constitutional rights, the classification must be "suitably tailored" to serve a "compelling state interest" and that classifica-

tions based on gender and legitimacy are subjected to "heightened review").

E.  Due-Process Claims

1.  Property Interest in Employment

In order to establish a deprivation of procedural due process, a plaintiff must demonstrate that he possesses a protected liberty or property interest, that he was deprived of that interest, and that he was not afforded adequate procedures to defend against the deprivation prior to or following the deprivation. *See Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir. 1985). If a property interest is established, the court must then evaluate what process is due. *See Kelleher,* 761 F.2d at 1086. "[D]ue process is satisfied when the employee receives oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Macklin v. City of New Orleans*, 293 F.3d 237, 241 (5th Cir. 2002)(citations and internal quotations omitted). In order to maintain a substantive-due-process claim in the context of public employment, a plaintiff must plead and prove a property interest in continued employment, and that the employer's termination of her employment was arbitrary and capricious. *Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993). Substantive due process "requires only that public officials exercise professional judgment, in a nonarbitrary and noncapricious manner, when

23

depriving an individual of a protected property interest." *Texas v. Walker*, 142 F.3d 813, 819 (5th Cir. 1998).

In order to have a property interest, one must have more than a unilateral expectation of the continued receipt of a benefit. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Rather, the plaintiff must "have a legitimate claim of entitlement to it." *Id.* "Public employees must demonstrate a property right founded on a legitimate claim of entitlement based on mutually explicit understandings." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (internal quotations omitted). A public employee has a property interest in her job when he may only be fired for misconduct or malfeasance. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-41 (1985).

### 2. Liberty Interest in "Name-Clearing Hearing"

To prevail on a § 1983 claim that a cognizable liberty interest was infringed by the denial of a name-clearing hearing, the plaintiff must establish seven elements. *See Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000). First, the plaintiff must show he was discharged. *Id.* Second, he must show "stigmatizing charges were made against [him] in connection with the discharge." *Id.* He must then show that the charges were false. *Id.* Fourth, the plaintiff must establish "[]he was not provided notice or an opportunity to be heard prior to [his] discharge." *Id.* Fifth, the

plaintiff must demonstrate "that the charges were made public." *Id.*
Sixth, the plaintiff must have requested a hearing to clear his
name. *Id.* Finally, the employer must have denied such request.
*Id.*

III. Analysis

    A. Due-Process Analysis

        1. Procedural and Substantive Due Process

In her complaint, Dreyer alleges that her termination deprived
her of both substantive and procedural due process. She alleges
that both Hugman and Kendrick participated in the decision to
terminate her despite the fact they both suffered from conflicts of
interest. She also claims to be entitled to a name-clearing hear-
ing. But at no point in her complaint does Dreyer allege that she
has a property interest in her public employment.

Dreyer does, however, address the issue of her alleged property
interest in her summary-judgment response brief. In that brief,
Dreyer contends that, having survived her probationary period, "she
had a due process right to appeal her termination." [Resp. Br. at
48.]

Dreyer's due-process arguments fail to establish a property
interest in her employment. Property interests must be evaluated
by referring to state law. *See Bishop v. Wood*, 426 U.S. 341, 344
(1976). A public employee has a property interest in his job when

25

he may only be fired for misconduct or malfeasance. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-41 (1985). In Texas, however, the general rule is that "absent a specific contract term to the contrary, employment contracts are terminable at will by either party." *Zimmerman v. H.E. Butt Grocery Co.*, 932 F.2d 469, 471 (5th Cir. 1991). The summary-judgment evidence demonstrates that the arrangement between the City and Dreyer is no exception. Instead, her employment is explicitly at will. As noted above, both the grievance procedure and the handbook state that "[a]ll employees hold their positions *at the will and pleasure of the City*" and that "the existence of and access to the appeal procedure shall not constitute any limitation on the right of the City of Southlake to manage its affairs." [Mtn. App. at 222; Resp. App. at 287] Both the grievance procedure and the handbook go on to state that employees "may be terminated or otherwise adversely affected with or *without cause*." [Mtn. App. at 222; Resp. App. at 287 (emphasis added)] The handbook contains even stronger language, directly refuting any contention that the procedure itself creates a property interest in City employment. According to the handbook "[t]he successful completion of the probationary period" does not limit the City's discretion in employment matters. [Mtn. App. at 222.]

There is nothing, in either Dreyer's complaint, summary-judgment brief, or her summary-judgment evidence that indicates the City's procedures limit it to terminating employees for cause.

Dreyer has, therefore, failed to state a property interest suffi-cient to invoke either substantive- or procedural-due-process protections. *See Shaboon v. Duncan*, 252 F.3d 722, 732 (5th Cir. 2001) (concluding the plaintiff had not stated a property interest because there was no agreement that she would be terminated only for cause).

Dreyer also complains that persons with interests adverse to her own participated in the grievance procedure. She further complains that, in accordance with the policy's purpose statement, she was entitled to reach a "satisfactory solution" to her employ-ment dispute through the City's procedures. Even assuming the process afforded her was not in strict compliance with the City's procedures, Dreyer's due-process claim still fails. A court need only assess what procedure is due after the plaintiff establishes a protected interest. *See Hughes*, 204 F.3d at 225 (noting due process "requirements never arise unless the plaintiff can allege some deprivation of liberty or property"); *see also Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993) (describing the substantive-due-process analysis). Dreyer has failed to establish such an interest in her employment and has, therefore, failed to demonstrate an entitlement to any process. Thus, Hugman and Kendrick's participation in the grievance process and appeal is not a due-process violation.

Moreover, Dreyer's complaint regarding the "satisfactory

solution" purpose statement essentially calls upon the Court to conclude that the City's grievance procedure mandates an outcome favorable to Dreyer. But the procedure's beneficent purpose statement does not eviscerate the plain language of the procedure that states that "employees hold their positions at the will and pleasure of the City and such positions may be terminated or otherwise adversely affected with or without cause." [Resp. App. at 287.] Indeed, the purpose statement is by its terms qualified in that mutually satisfactory resolutions are to be reached "whenever *possible*." [Resp. App. at 284 (emphasis added).] And, again, the City's procedures are only relevant to the extent they protect Dreyer's employment, something in which, as discussed above, Dreyer has no property interest.

2. Name-Clearing Hearing

As described above, in order to establish a claim for a name-clearing hearing, the plaintiff must establish that the charges against her were false. *See Hughes*, 204 F.3d at 226. The City argues that Dreyer is precluded from challenging the statement from the court of appeals's opinion that Dreyer "was terminated for falsifying her timesheets, being absent from work, working at home, and working overtime." *See Dreyer*, 2008 U.S. App. LEXIS 18501, at *2. Taken to its extreme, this statement could have the effect of precluding all of Dreyer's claims. *See*, *e.g.*, *Beattie v. Madison*

*County Sch. Dist.*, 254 F.3d 595, 601 (5th Cir. 2001) (noting plaintiff must prove speech motivated the adverse employment decision as part of plaintiff's retaliatory-termination claim and the defendant may then prove a legitimate reason for the termination); *see also Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000) (plaintiff must establish employer's allegations were false as part of claim to name-clearing hearing).  All that was before the court of appeals was whether summary judgment was proper in light of the discovery stay and whether the individual defendants' actions were reasonable.  *See Dreyer v. Yelverton*, No. 07-10970, 2008 U.S. App. LEXIS 18501, at *23 (5th Cir. September 16, 2008).  The court of appeals's analysis concluded only that the individual defendants' actions were reasonable, *see id.*, not that the allegations underlying those actions were true.  Thus, Dreyer is not precluded from contesting the veracity of the City's allegations against her.  *See Rufenacht*, 656 F.2d at 202-03 ("Collateral estoppel is appropriate only when the *identical issue* has been fully litigated . . . .") (emphasis added).

And Dreyer has produced evidence to do just that.  As to the City's allegation that Dreyer had performed work at home without permission, according to Farahnak, Dreyer had been given permission to prepare the water-quality report from home in 2004 due to Dreyer's having the necessary software only at her home and being subject to constant interruption at work.  [Resp. App. at 248,

Farahnak Dec. at ¶ 5.]  Dreyer continued to prepare the report at home in subsequent years.  [*Id.*]  In regard to the City's allegation that Dreyer failed to work during her set work schedule and filed false timesheets, Farahnak notes that, due to her husband's illness, Dreyer had been granted permission to "work slightly different hours than what the City of Southlake typically mandated." [*Id.* at 248, ¶ 4.]  Farahnak claims to have instructed Dreyer to "submit time sheets that reflected hours that were different from those she actually worked" because "[t]he configuration of the time sheet did not allow for flexibility in entering hours other than 8 a.m. through 5 p.m." [*Id.*]

In her brief, Dreyer further asserts that Kendrick was aware of her flexible working arrangement and that she had informed Kendrick on the days she was to be absent from or late to work. Dreyer argues that Kendrick does not dispute in his deposition that she gave him such notices.  Dreyer makes this allegation without citation to Kendrick's deposition.  The City has responded to Dreyer's use of Kendrick's deposition with its Motion for Leave to Supplement Summary Judgment Record Under Rule of Optional Complete-ness [doc. #93].  That motion argues that Dreyer "carefully selected [portions of Kendrick's deposition] to avoid presenting a correct and complete picture" and that Kendrick's deposition makes it clear that Dreyer "was required to not only notify him but get his permis-sion to be absent or late." [City's Mtn. to Supp. at 1, 2].  The

City's motion to supplement is DENIED as MOOT however, because, regardless of whether a fact issue exists as to the falsity of the City's allegations against Dreyer, she has failed to establish that the City publicized the allegations or that it denied her request for a hearing.

As part of her claim of denial of due process by failing to allow her a name-clearing hearing, Dreyer must establish that the charges against her were made public. *See Hughes*, 204 F.3d at 226. In its motion for summary judgment, the City asserts that the allegations against Dreyer were never made public and supports this with the declarations of three of the City officials involved in Dreyer's termination and grievance process. [Mtn. at 44; Mtn. App. at 235, Kendrick Dec. at ¶ 20; Mtn. App. at 251, Hugman Dec. at ¶ 16; Mtn. App. at 261, Yelverton Dec. at ¶ 23.] *Dreyer does not address this argument in her brief*. And, despite her substantial appendix in support of her motion, she has not otherwise brought to the Court's attention evidence that creates an issue of fact on this point. *See Skotak*, 953 F.2d at 916 n.7 (5th Cir. 1992) (stating Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment).

Dreyer is also required to demonstrate that, after requesting a hearing regarding the allegations against her, she was denied such hearing. *See Hughes*, 204 F.3d at 226. Dreyer acknowledges, how-

ever, that she pursued an internal appeal. [Resp. Br. at 29; Resp. App. at 352, ¶ 32.] She admits to having a hearing before the then public works administration director Price. [Resp. App. at 138, Kendrick Dep. at 262] After Price upheld the termination decision, Dreyer appealed to Yelverton, the city manager. [Resp. App. at 352, Dreyer Dec. at ¶ 32]. Yelverton held a hearing and again Dreyer's termination was upheld. [Mtn. App. at 259, Yelverton Dec. at ¶ 14.] Dreyer has, therefore, failed to establish an essential element of her name-clearing claim. *See Hughes*, 204 F.3d at 226, 228 (noting publication is a necessary element of a name-clearing claim and holding that the fact that an employee will have to disclose the reason for her discharge in seeking new employment insufficient to support a claim to a name-clearing hearing); *also cf. Rosenstein v. City of Dallas*, 876 F.2d 392, 396 (5th Cir. 1989) ("[W]here the only issue was Rosenstein's guilt or innocence of the particular charge that stigmatized him, his request to participate in established grievance, appeals, or other review procedures to contest defamatory charges was sufficient to state a request for a name-clearing hearing.").

Dreyer makes two complaints relative to the appellate procedures afforded her. First, she complains about the ultimate result, claiming that employees are to be given warnings before being terminated under the City's procedure. Second, Dreyer contends that the procedures were tainted by the participation of adversely

interested parties.

In his deposition, as highlighted by Dreyer, Farahnak states that the City practiced "progressive discipline" and that the City provided employees "awareness warnings" before terminating them. [Resp. App. at 250, Farahnak Dec. at ¶ 17.] Farahnak acknowledges, however, that this was merely his experience. [*Id.*] He does not point to any portion of the City's procedures which mandated the use of progressive discipline. Further, he acknowledges that under some circumstances employees were immediately terminated. [*Id.*]

Regardless of whether Farahnak's statements are taken as evidence of an informal policy or practice by the City to use progressive discipline, the City's failure to adhere to such policy or practice in regard to Dreyer does not establish a due-process violation. *See Brown v. Texas A & M Univ.*, 804 F.2d 327, 335 (5th Cir. 1986) ("The failure of a state agency to comply with its internal regulations is insufficient as a matter of law to establish a violation of Due Process because constitutional minima neverthe-less may have been met."). Thus, the issue becomes whether Dreyer's complaint that adversely interested City officials--Hugman and Kendrick--were allowed to participate is sufficient to vitiate the hearings she received.

The Court's research has revealed no case within the Fifth Circuit addressing in significant detail the question of the ade-quacy of a hearing for the purpose of clearing one's name. The

Court, therefore, turns to basic procedural-due-process principles in analyzing whether the hearing afforded Dreyer was sufficient under the Fourteenth Amendment. *See Patterson v. City of Utica*, 370 F.3d 322, 336-37 (2d Cir. 2004) (applying the factors announced in *Matthews v. Eldridge*, 424 U.S. 319 (1976) in analyzing the adequacy of a name-clearing hearing). "To determine what process is constitutionally due, the Supreme Court has advised us to balance three factors: 'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.'" *McIntosh v. Partridge*, 540 F.3d 315, 324 (5th Cir. 2008) (quoting *Matthews*, 424 U.S. 335).

The plaintiff employee's interest--his reputation and the effect the allegations will have on his standing in the community and job prospects--as well as the public employer's interest in making personnel decisions are strong. *See Patterson*, 370 F.3d at 336; *also cf. Connick v. Myers*, 461 U.S. 138, 150-51 (1983) (noting, in the context of a First Amendment claim, that the government has an "interest in the effective and efficient fulfillment of its responsibilities to the public" and that "the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs"). And while the procedures employed by the City, as described by Dreyer, do involve some risk

that false allegations could go unrefuted, given the nature of the relief to be afforded in a name-clearing case, the Court concludes the City's procedures satisfy due process. *See Patterson*, 370 F.3d at 336 (noting that the risk to be assessed in a name-clearing case is the risk false allegations will go unrefuted); *see also McIntosh*, 540 F.3d at 324 (noting a court is to consider the process afforded and the value of any additional process under *Matthews*).

"[T]he process due [to] an individual [who has established an entitlement to a name-clearing hearing] is merely a hearing providing a public forum or opportunity to clear one's name, not actual review of the decision to discharge the employee." *Rosenstein*, 876 F.2d at 395 (citing *Board of Regents v. Roth*, 408 U.S. 564, 573 n.12 (1972)). An employee does not have an interest in particular outcome as a result of a hearing but instead only has a right to "an opportunity to salvage her name." *Segal v. City of New York*, 459 F.3d 207, 216 (2d Cir. 2006).

Dreyer asserts that she had information implicating Hugman in misuse of City resources and approving false timesheets and that Hugman knew she had provided this information to the Tarrant County district attorney's office as part of its investigation. [Resp. App. at 11-12, 14-18, 20-23, Dreyer Dep. at 19-20, 22-26, 31-34; Resp. App. at 349, Dreyer Dec. at ¶ 10; Resp App. at 152-53, Hugman Dep. at 30-31.] She complains that, despite this apparent conflict of interest, Hugman was allowed to participate in the initial

decision to terminate her by advising Kendrick regarding the decision. [Resp. App. at 135, Kendrick Dep. at 249.] Dreyer also claims that Kendrick had an improper motive for terminating her in that he wanted to "move forward" after the investigation because it was a "sore subject," but this claim is so speculative as to not warrant consideration. *See Liquid Air Corp.*, 37 F.3d at 1075 ("[S]ummary judgment is appropriate in any case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.") (internal quotation and citation omitted).

As for Hugman, regardless of his participation, Dreyer's appeals were to Price and Yelverton. Dreyer does not contest that Price conducted a hearing and considered the information she provided as well as that provided by Kendrick. [Mtn. App. at 240, Price Dec. at ¶ 9.] Nor does Dreyer contest that she was allowed to appeal Price's decision to Yelverton who also conducted a hearing and considered various documents and "all information and statements that [Dreyer] chose to provide." [Mtn. App. at 259, Yelverton Dec. at ¶ 14.] Thus, despite Hugman's participation, the process afforded Dreyer by the City is sufficient under the Fourteenth Amendment. *Cf. Young v. City of St. Charles*, 244 F3d 623, 626-28 (8th Cir. 2001) (holding appeal to city administrator and review board per city procedures sufficient "name-clearing hearing" although plaintiff contended that the board had not considered all evidence);

*see Thomas v. Bd. of Trustees*, 515 F. Supp. 280, 283-84, 290-91 (S.D. Tex. 1981) (holding that the provision of a hearing before the school board that had initially approved the plaintiff employee's adverse employment action was sufficient process).

C.  Equal Protection

In its summary-judgment brief, the City argues that Dreyer's equal-protection claim is merely a restatement of her First Amendment claim in that Dreyer claims to have been treated differently due to her speech.  Dreyer does not address this claim in her brief.

A plaintiff may not advance an equal-protection claim that "amounts to no more than a restatement of [the plaintiff's] first amendment claim." *Thompson v. City of Starkville*, 901 F.2d 456, 468 (5th Cir. 1990).  In *Thompson*, the court explained that "the right to free speech under the first amendment is essentially an individual right." *Id.* Because the plaintiff had failed to "claim that anyone other than he was similarly treated," the court concluded that the plaintiff had failed to state an equal-protection claim. *See id.*

In this case Dreyer has offered proof that others have been terminated or forced out of their employment with the City as a result of their speech.  She does not, however, offer this evidence in support of her equal-protection claim.  Rather, her complaint explicitly focuses on the City's treatment of her as an individual.

She complains that "the city has no compelling, or even legitimate, interest in the selective enforcement of its policies and procedures *against Dreyer*." [Ptlf. Comp. at 13, ¶ 58.]   She goes on to complain that "[s]he is entitled to equal protection" and that she has suffered injury "[a]s a result of defendants' infringement of Dreyer's constitutional right." [*Id.* at 14, ¶ 59.]   There is no mention of the rights of others or any other indication that Dreyer is complaining as a member of a protected class.   Neither her complaint, response to the summary-judgment motion, nor her summary-judgment evidence attempt to identify, in regard to her equal-protection claim, the classification that the City has attempted to impose on persons within its employ.   Her claim under the equal protection clause thus fails.   *See Engquist v. Oregon Dept. of Agric.*, 128 S. Ct. 2146, 2154-55 (2008) (concluding that the "class-of-one" theory of equal protection has no application in the public-employment context); *see also Mahone*, 836 F.2d at 932 ("To determine whether Mahone has pled a cognizable equal protection claim . . . we first look to see if his complaint challenges the manner in which he has been "classified" by the District.").

D.  First Amendment Retaliation Claim

As noted above, a prima-facie case of retaliation for the exercise of one's First Amendment right to free speech involves establishing four elements.  As to the first, it has been estab-

lished that Dreyer was terminated and "there is no question that termination of employment qualifies as an adverse employment action." *Jordan v. Ector County*, 516 F.3d 290, 295 (5th Cir. 2008).

As to the second element, the Court must engage in a two-step evaluation, first determining whether Dreyer was speaking as a citizen and next whether her speech was on a topic of public concern. *See Davis v. McKinney*, 518 F.3d 304, 311-12 (5th Cir. 2008) (describing the analytical framework in light of the Supreme Court's decision in *Garcetti*). Although it does not rely explicitly on the *Gacetti* two-part analytical framework, the City argues that, while the content of Dreyer's speech was on a topic of public concern, she engaged in such speech as a public employee rather than as a private citizen. It bases this on its contention that all employees involved in the district attorney's investigation into possible corruption in the public works administration were asked to cooperate by the City and were subject to discipline if they failed to do so. Moreover, the City claims that the supervisors of employees asked to cooperate in the investigation were to authorize time away from work and otherwise make such employees available. Employees were also allegedly paid their normal compensation for the time spent meeting with prosecutors or investigators. As stated by Yelverton in her affidavit, "[q]uite simply, the City viewed it as a job responsibility for its employees to cooperate with the Tarrant D.A. investigation of possible wrongdoing within the City." [Mtn.

App. at 265, ¶ 35.]

Dreyer does not contest these facts and responds that the City's argument "merits only brief discussion." She quotes *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) stating that "[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials . . . concerns matter of public import." Dreyer's brevity is misleading, however, because the fact that the speech was on an important public issue such as official corruption is irrelevant to the threshold inquiry under *Garcetti*. *See Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir. 2007) (discussing *Garcetti*).

Dreyer does attempt to distinguish *Teague v. City of Flowermound*, 179 F.3d 377 (5th Cir. 1999), the case upon which the City relies most heavily. In *Teague*, Teague and Burkett, two police officers employed in a supervisory capacity, became aware that another officer may have committed perjury. Teague and Burkett began investigations into the matter but, once it became apparent that an indictment would be sought, the Flower Mound chief of police, Dave Brungardt, halted their investigations. Burngardt then outsourced the investigation to a private firm that cleared the officer of the perjury allegations. Unhappy with these devlopments, Teague and Burkett sought a meeting with Burngardt and, after being denied and developing a suspicion that Burngardt was covering for the officer, they filed a grievance against Burngardt. In the

40

meantime, Teague and Burkett had been transferred and one of the officers that filled their positions reported to Burngardt that a backlog of cases had developed during their tenure. Burngardt launched an investigation into Teague and Burkett that culminated in a finding that they had been derelict in their duty. He then terminated them.

Teague predates the Supreme Court's decision in Garcetti and, therefore, does not strictly apply Garcetti's threshold requirement. The court in Teague does, however, apply the content-form-context analysis in conjunction with the "citizen versus employer" test employed pre-Garcetti. In applying the content-form-context test, the court acknowledges that the content of the speech, dealing as it did with official misconduct, was public. See Teague, 179 F.3d at 383. Nevertheless, the court held that the speech was not protected as public speech based on its conclusion that, in light of the form and context of the speech, the speech was private. See id. The context of the speech was in an internal grievance proce-dure and its form was that of a personal grievance for having been wrongfully removed from the perjury investigation. See id. The court further supported its determination that the speech at issue in Teague was not protected as public speech with a conclusion that the speech had been engaged in as public employees. See id.

Dreyer contends that Teague is inapposite to the instant case because in Teague the speech was not merely within the public-

employment context but arose in the context of an employer-employee dispute.  This is not, however, a meaningful distinction.  Admittedly, the plaintiffs in *Teague* used a formalized grievance procedure to voice their concerns about police misconduct and the police chief's failure to take appropriate action.  *Dreyer*, on the other hand, engaged in her speech during an investigation into impropriety within the public works administration.  But neither an employer's formal description of policy nor an employee's failure to use formal means of communication are dispositive on the speech-as-a-citizen or public-employee issues.  *See Garcetti*, 547 U.S. at 424-24; *see also Williams*, 480 F.3d at 693-94 (concluding that a memo written by a school district's athletic director, although not required by his job, was so closely related to his duties as to be unprotected under *Garcetti*).  Ultimately, just as in *Teague*, Dreyer voiced her concerns about official misconduct (a topic admittedly of public concern) internally to her superior as required by official policy--that is, as a public employee.  *See Teague*, 179 F.3d at 383 (use of internal procedure "suggest[s] that speech was private in context, rather than public"); *also cf. Davis*, 518 F.3d at 315 ("Speech related to an employee's job duties that is directed within the employee's chain of command is not protected.").

Indeed, the distinction pointed out by Dreyer weighs in favor of concluding that her speech was as an employee rather than a citizen.  In *Teague* the plaintiffs made use of a formal procedure

but did so of their own volition. Dreyer on the other hand was required to cooperate in the investigation as part of her job responsibilities. *See Williams*, 480 F.3d at 693 (noting that the prosecutor in *Garcetti*, in writing the memo for which he was terminated and that the Supreme Court deemed unprotected by the First Amendment was "doing exactly what he was required to do"); *but cf. Branton*, 272 F.3d at 740-41 (concluding, pre-*Garcetti*, that the plaintiff internal affairs officer's report of another officer's false testimony during an administrative hearing was protected as a matter of public concern because the city's "ethical standards of truthfulness and honesty" were understood to impose on plaintiff a duty to report false testimony by other officers).

Other factors also weigh in favor of concluding that Dreyer's speech was as a public employee. Case law makes the distinction between "speech that is the kind of activity engaged in by citizens who do not work for the government and activities undertaken in the course of performing one's job." *Id.* at 693 (internal citations and quotations omitted). Although a court may not base its decision on this fact alone, a court may consider whether the plaintiff learned of the information as a product of his public employment. *See Williams*, 480 F.3d at 694 (noting, in concluding that the plaintiff's speech was in the course of his public duties, that the plaintiff had "special knowledge" due to his public position); *see also Charles v. Grief*, 522 F.3d 508, 513 (5th Cir. 2008). Ulti-

mately, the inquiry under *Garcetti* is a practical one. *See*
*Garcetti*, 547 U.S. at 424.

As stated by Yelverton and uncontested by Dreyer, Dreyer's
cooperation in the investigation was a job responsibility. Any
information she possessed regarding official misconduct resulted
from her observations while performing her own duties as a public
employee. Thus, both the information she possessed and her duty to
disclose it were due to her public employment. This is, therefore,
an activity undertaken as part of Dreyer's job, not speech of the
kind engaged in by private citizens.

The parties devote much of their briefing to the issue of
whether the City officials who played a role in Dreyer's termination
were aware of her cooperation in the investigation and whether her
termination was in retaliation for such cooperation. Dreyer also
argues that the fact that she and others who implicated City offi-
cials in wrongdoing were treated differently from other employees,
plus the City's varying and shifting reasons for Dryer's discharge,
demonstrate that Dreyer's speech motivated the termination decision.
Finally, Dreyer argues that Yelverton, as the city manager, is a
policy maker for § 1983 municipal-liability purposes. Having
concluded that Dreyer's speech is not protected as speech on a topic
of public concern, the Court need not address these issues. *See*
*Davis*, 518 F.3d at 312 (noting under *Garcetti* that "[o]nly when the
government penalizes speech that a plaintiff utters 'as a citizen'"

must a court perform the remainder of the retaliatory termination analysis); *Doe v. Rains County Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995) (noting that a plaintiff must first establish a deprivation of a right secured by the Constitution or federal law, and then that such deprivation was under color of state law under § 1983).

    SIGNED November 18, 2008.


                                   TERRY R. MEANS
                                   UNITED STATES DISTRICT JUDGE